```
UNITED STATES BANKRUTPCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:                                           :
                                                 :          Chapter 7
IRWIN JACOBS,                                    :
                                                 :          Case No. 22-10132 (MEW)
                    Debtor.                      :
------------------------------------------------------------x
J-K APPAREL SALES CO. INC and                    :
S&I SALES CO., INC.,                             :
                                                 :
                    Plaintiffs,                  :
                                                 :
              v.                                 :          Adv. Pro No. 22-01074 (MEW)
                                                 :
IRWIN JACOBS,                                    :
                                                 :
                    Defendant.                   :
------------------------------------------------------------x
```

# DECISION AS TO DISCHARGEABILITY OF OF DEBT

A P P E A R A N C E S:

SCHRIER SHAYNE KOENIG SAMBERG & RYNE P.C.
New York, New York
*Attorney for Plaintiffs*
   By:  Richard E. Schrier, Esq.

MORRISON AND TENENBAUM, P.C
New York, New York
*Attorneys for Defendant*
   By:  Joshua S. Androphy, Esq.
          Lawrence Morrison, Esq.

WALDEN MACHT & HARAN LLP
New York, New York
*Attorney for Defendant*
   By:  Amanda Senske, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

1

J-K Apparel Sales Co., Inc. and S&I Sales Co. ("**Plaintiffs**") Inc. brought this adversary proceeding against Irwin Jacobs ("**Jacobs**") seeking an order determining that a judgment obtained by the Plaintiffs against the Defendant is excepted from discharge pursuant to 11 U.S.C. § 523 and for an order vacating the automatic stay imposed by 11 U.S.C. § 362(a) in order to permit the enforcement of the judgment. While some of the facts are disputed, the following facts have been stipulated to by the parties or found by the New York Supreme Court, County of Nassau.

1. Jacobs was a 50% owner of Plaintiffs J-K Apparel Sales Co., Inc. ("**J-K**") and S&I Sales Co., Inc. ("**S&I**"). Steve Kenger ("**Kenger**") owned the other 50% of each entity.

2. Jacobs and Kenger each held interests of some kind in Prestige Global Co., Ltd. ("**PG-Taiwan**"), though they have disagreed as to whether these interests took the form of shareholdings, formal or informal partnership interests, interests in a trust, or something else. The directors of PG-Taiwan were Mark Cheng, David Lee, Herman Wang, Jacobs and Kenger.

3. Until January 24, 2015, J-K and S&I were sales representatives of PG-Taiwan and the affiliated Prestige Global PTE companies located throughout Asia ("**PG Affiliates**"). PG-Taiwan is a management company that coordinated various activities and financial record-keeping for the Prestige Global companies.

4. Prior to January 24, 2015, J-K's and S&I's business was to identify private label products to sell to mostly "big box" retail customers in the U.S., Canada, and Europe, and to coordinate with the PG Affiliates to arrange the production of the desired products. Sales typically were made directly between the factories and the customers. The factories paid commissions for sourcing customers, and most of the customers (the retailers) paid commissions for sourcing the factories that could produce products at the desired prices.

5. J-K and S&I were entitled to receive commissions on sales.

2

6. In early 2015, Prestige Global contended that J-K and S&I had been overpaid commissions in the amount of $2,585,139. Following disagreements, a majority of the board members of Prestige Global terminated the sales representative relationships with J-K and S&I.

7. After J-K and S&I were terminated, Kenger alleged that Jacobs had been paying personal expenses by diverting some of the bonus commissions that should have been paid to J-K and S&I.

8. On January 31, 2015, Kenger, as an officer, director and 50% shareholder of the Plaintiffs, instituted an action in the name of J-K and S&I and against Jacobs in the New York Supreme Court, County of Nassau. Index #600612/2015. The Complaint asserted causes of action for (1) mismanagement, (2) diversion of assets, (3) breach of fiduciary duty, (4) accounting, and (5) dissolution of the Plaintiff corporations.

9. On or about October 31, 2017, on a motion for summary judgment, the Supreme Court entered an order granting summary judgment in favor of the Plaintiffs and against Jacobs. The relevant portions of the state court's decision state the following:

> In support of plaintiff's motion for summary judgment on the complaint, Kenger alleges that Jacobs mismanaged the business, paid excessive salaries to Kenger and Jacobs, and gave "no show" jobs to Jacobs' relatives. Additionally, Kenger alleges that between 2006 and 2014 Jacobs directed Taiwanese shareholder Mark Cheng to make payments to third parties for Jacobs' personal expenses in the total amount of $4,874,455 (ex MM). The court notes that $2,126,721 was allegedly paid before 2009.
>
> In opposition, Jacobs alleges that he and Kenger "were equal partners, drew the same salary, shared control, and made all major strategic and financial decisions together." . . . While Jacobs claims that the payments for his own personal expenses were "dividends," he has not established that a similar distribution was made to Kenger as the other 50% shareholder.
>
> A shareholder who has participated in wrongful activity may not subsequently challenge its legality in a derivative suit (**Pinnacle Consultants v. Leucadia Nat'l Corp.,** 94 NY2d 426, 433 [2000]). Particularly in closely held corporations, a shareholder who did not oppose corporate action may be equitably estopped from challenging it (Id).

3

> The court concludes that Kenger acquiesced in J-K Apparel's providing "no show" jobs to relatives of the principal shareholders. Indeed, Kenger's wife was also employed in this fashion. Additionally, Kenger acquiesced in the salaries which were received by both Kenger and Jacobs. However, there is no evidence that Kenger acquiesced in the distributions to pay Jacobs' personal expenses. Indeed, Kenger was not aware of the distributions until he learned of them in the course of discovery.
>
> New York law does not provide a single statute of limitations for breach of fiduciary duty claims (**IDT Corp. v. Morgan Stanley**, 12 NY3d 132, 139 [2009]). Rather, the choice of the applicable limitations period depends on the substantive remedy that the plaintiff seeks (Id). Where the remedy is purely monetary in nature, a three year statute of limitations of CPLR § 214(4) applies (Id). Where the relief sought is equitable in nature, the six year limitations period of CPLR § 213(3) applies (Id).
>
> In the fourth cause of action, plaintiffs assert a claim for the equitable remedy of accounting. Thus, the court will apply the six year statute of limitations. J-K Apparel may recover the payments made to third parties to pay Jacobs' personal expenses beginning in 2009.
>
> Accordingly, plaintiffs' motion for summary judgment with respect to their first four causes of action in the complaint is **granted** to the extent that plaintiff J-K Apparel may submit a judgment against defendant Jacobs in the amount of $4,874,455 minus $2,126,721, for a net amount of $2,747,734 without interest. With respect to the fifth cause of action for dissolution of J-K Apparel and S&I Sales, plaintiffs' motion for summary judgment is **granted**. Plaintiffs may submit a final order of dissolution for each company (See BCL § 1111).

*J-K Apparel Sales Co., Inc. v. Jacobs*, Index No. 600612-2015 (N.Y. Sup. Ct. Oct. 21, 2017) (emphases in original).

10. Jacobs filed a notice of appeal from the summary judgment decision on November 19, 2017. The Appellate Division of the Supreme Court, Second Department affirmed the summary judgment rulings in a decision dated December 9, 2020. *See J-K Apparel Sales Co., Inc. v. Jacobs*, 189 A.D.3d 1011 (N.Y. App. Div. 2020). The relevant portion of the appellate court's decision stated:

> Jacobs's contention that the Supreme Court erred in awarding J-K and S&I summary judgment on the first through fourth causes of action related to his alleged diversion of funds to himself that belonged to the plaintiffs, namely mismanagement, diversion of assets, breach of fiduciary duty, and for an

4

> accounting, respectively, is without merit. Business Corporation Law § 720(b) authorizes a corporation, or an officer or director thereof, to commence an action to redress corporate waste including diversion of corporate assets or breach of fiduciary duty owed by officers and directors of the corporation (*see Rapoport v Schneider*, 29 NY2d 396, 400, 278 NE2d 642, 328 NYS2d 431 [1972]; *Brown v Brown*, 143 AD2d 248, 249, 532 NYS2d 157 [1988]; *Conant v Schnall*, 33 AD2d 326, 327-328, 307 NYS2d 902 [1970]). In order to establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct (*see Daly v Kochanowicz*, 67 AD3d 78, 95, 884 NYS2d 144 [2009]; *Kurtzman v Bergstol*, 40 AD3d 588, 590, 835 NYS2d 644 [2007]). "The right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of the duty imposed by that relationship respecting property in which the party seeking the accounting has an interest" (*Palazzo v Palazzo*, 121 AD2d 261, 265, 503 NYS2d 381 [1986]; *see AHA Sales, Inc. v Creative Bath Prods., Inc.*, 58 AD3d 6, 23, 867 NYS2d 169 [2008]). Here, we agree with the court's determination that J-K and S&I demonstrated their prima facie entitlement to judgment as a matter of law on those causes of action through documentary and testimonial evidence that Jacobs diverted funds to himself that belonged to J-K and S&I. In opposition, Jacobs failed to raise a triable issue of fact. Accordingly, the court's granting of that branch of the motion of J-K and S&I which was for summary judgment on the first through fourth causes of action was warranted.

*Id*. at 1013. Subsequent motions by Jacobs seeking reargument were denied, and his motion seeking permission to appeal to the New York Court of Appeals was denied.

11.  Jacobs filed a motion in late 2021 seeking an Order vacating the state court's 2017 summary judgment decision. He argued that vacatur was proper because "the Order was procured by Kenger's fraudulent testimony that he did not receive similar 'distributions' from Prestige Global Co., Ltd. as Jacobs received." The state court denied that motion in a decision and order dated January 18, 2022.

12.  Jacobs filed his chapter 7 bankruptcy petition on February 3, 2022. On June 30, 2022, this Court entered an Order that lifted the automatic stay for the limited purpose of allowing the entry of a judgment in the state court. The state court subsequently entered judgment in favor of J-K and S&I on October 25, 2022 in the principal amount of $2,747,734, plus pre-judgment interest of $233,770.21 and costs of $400, for a total of $2,981,904.21.

5

**Jurisdiction**

This Court has jurisdiction over this adversary proceeding and the power to issue a final order pursuant to 28 U.S.C. §§ 1334(b) and 157(a), 11 U.S.C. § 523 and Fed. R. Bankr. P. 4007.

**The Parties' Contentions**

The Plaintiffs filed this adversary proceeding on March 25, 2022, seeking a declaration from this Court that the debt owed by the Debtor to the Plaintiffs pursuant to the state court judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(2) and (a)(4). AP ECF No. 1, at ¶ 43. At one point during pre-trial proceeding the Plaintiffs sought to add a contention that the judgment is excepted from discharge under section 523(a)(6) as well, but that contention came too late in the process and in any event the Plaintiffs subsequently abandoned it. In their post-trial brief, the Plaintiffs state that they seek only a declaration that the debt owed to Plaintiffs is non-dischargeable because the debt arose from "defalcation while acting in a fiduciary capacity . . ." 11 U.S.C. § 523(a)(4). Prior contentions made under section 523(a)(2) of the Bankruptcy Code, and prior allegations that Jacobs' conduct amount to "fraud," "embezzlement" or "larceny" for purposes of section 523(a)(4), have not been pursued. AP ECF No. 40, at 1.

Plaintiffs argue that from 2009 to 2014 Jacobs was responsible for managing all financial aspects of J-K and S&I, and that during this period he directed PG-Taiwan and another company (PG-Seychelles) to pay portions of the commissions owed to Plaintiffs to various third parties in the amount of $4.8 million. They state that the funds were thereby utilized to pay personal expenses on behalf of Jacobs and members of Jacobs' family. Plaintiffs argue that the state court judgment already contains all of the findings and determinations necessary to support the contention that Jacobs' conduct amounted to "defalcation" and that the debt is excepted from discharge under section 523(a)(4). They also argue that in 2020 Jacobs entered a guilty plea to charges of tax evasion regarding his failure to report the payment of his personal expenses as

income. In Plaintiffs' view, this shows that Jacobs knew he was diverting money from the Plaintiffs.

Jacobs contends that he did not believe, at the time, that he was diverting assets that belonged to J-K or S&I or that he was violating any duties owed to those companies or to Kenger. He alleges that he believed that the money that was used to pay his personal expenses was rightfully his and that it represented his share of a profit split as a 21% owner of the PG group. He contends that he understood that such profit distributions were separate and distinct from the payments of sale commissions to J-K and S&I. He acknowledges that the profit distributions were not reported for tax purposes and acknowledges that he deliberately misled the taxing authorities, but says that he did not understand or believe that the payments were diversions of money belonging to J-K and S&I.

### **Elements of the § 523(a)(4) Claim**

A party who seeks to prove that a debt is nondischargeable under section 523 carries the burden of proof and must show, by a preponderance of the evidence, that the debt has been excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 291 (1991); *see Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006). Exceptions to discharge under the bankruptcy code are construed narrowly and genuine doubts should be resolved in favor of debtors. *See In re Hyman*, 502 F.3d at 66.

The state courts held that Jacobs occupied a position in which he owed a fiduciary duty to J-K and S&I, and Jacobs has not argued otherwise. The real question is whether Jacobs engaged in conduct that constituted "defalcation" as that term is used in section 523(a)(4).

The word "defalcation" is not defined in the Bankruptcy Code. Before 2013, the interpretation of the term gave rise to significant differences of opinion. In 2013, however, the

7

United States Supreme Court resolved the issue. The Supreme Court held that "defalcation" requires proof of a mental state "involving knowledge of, or gross negligence in respect to, the improper nature of the relevant fiduciary behavior." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013). The Court explained:

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty.

*Id.* at 274 (citations omitted). The lower court had applied an "objective recklessness" standard in the *Bullock* case, and the Supreme Court remanded the case with instructions "to apply the heightened standard that we have set forth." *Id.* at 277.

It is settled, then, that proof of "defalcation" requires proof that a debtor acted with a "culpable state of mind" in committing the acts that gave rise to a debt. *Schlosser v. Heinemann (In re Heinemann)*, AP Case No. 19-09028, 2022 Bankr. LEXIS 3391 (Bankr. S.D.N.Y. Dec. 2, 2022) (citing *Bullock,* 569 U.S. at 273–74); *Zohlman v. Zoldan*, 226 BR. 767, 777–78 (S.D.N.Y. 1998). "Defalcation" does not exist in cases where "fiduciaries who may have failed to account for funds or property for which they were responsible only as a consequence of negligence, inadvertence or similar conduct not shown to be sufficiently culpable." *In re Hyman*, 502 F.3d at 69. There must be "actual knowledge of the wrongdoing, conscious disregard to a substantial and unjustifiable risk of violating a fiduciary duty, or willful blindness to the same." *In re Heinemann*, 2022 Bankr. LEXIS at 12.

A debtor's knowledge of wrongdoing, or conscious disregard of the same, may be inferred from facts and credible testimony. *Chitester v. Watterson (In re Watterson)*, 524 B.R. 445 (Bankr.

8

E.D.N.Y. 2015). In the end, however, the court must conduct an inquiry "into the extent of a debtor's awareness of the risk involved in his actions," and cannot find that there was defalcation unless, "at a minimum," the court finds that the debtor was "conscious of, but nevertheless disregard[ed], a substantial and unjustifiable risk" that the debtor's conduct violated fiduciary duties. *Larsen v. Larsen (In re Larsen)*, 2018 Bankr. LEXIS 2462, *15 (Bankr. E.D.N.Y. 2018).

### **Whether the State Court Judgment and Decisions Resolved the Issue**

Plaintiffs have argued throughout these proceedings that the relevant factual and legal determinations were already made by the state courts and that no further proof is needed to establish that the judgment debt owed by Jacobs is excepted from discharge.

The doctrine of collateral estoppel is "intended to reduce litigation and conserve the resources of the court and litigants and it is based upon the general notion that it is not fair to permit a party to relitigate an issue that has already been decided against it." *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455 (1985). Collateral estoppel applies in bankruptcy proceedings and in proceedings "arising under Section 523(a) of the Bankruptcy Code in particular." *Denton v. Hyman*, 320 B.R. 493, 499 (Bankr. S.D.N.Y. 2005). A "prior adjudication may have preclusive effect in a subsequent dischargeability proceeding if the elements of the claim(s) in the prior proceeding are identical to the elements of § 523(a)." *Shau Chung Hu v. Lui (In re Lui)*, 658 B.R. 231, 239 (Bankr. E.D.N.Y. 2024) (citing *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991)); *Evans v. Ottimo*, 469 F.3d 278, 281 (2d. Cir. 2006).

Under New York law, collateral estoppel applies only when the following four conditions are fulfilled:

(1) the issue to be decided by this Court must be <u>identical</u> to the issue decided by the . . . [prior] Court;

(2) the identical issue must have been <u>actually litigated</u> in the . . . [prior] Court; and

9

>  (3) the issue must have been <u>actually determined</u> by the . . . [prior] Court Decision and Judgment.

*Denton*, 320 B.R. at 500 (emphasis in original); *Kaufman*, 65 N.Y.2d at 455–56. Collateral estoppel is a flexible doctrine and whether to apply it to a particular case depends on a "general notions of fairness involving a practical inquiry into the realities of the litigation." *Jeffreys v. Griffin*, 1 N.Y.3d 34, 42 (N.Y. 2003). The party seeking to apply collateral estoppel has the burden of showing that the relevant issue "was necessarily decided" in a prior action and is determinative in the present action. *77 Water St., Inc. v. JTC Painting & Decorating Corp.*, 148 A.D.3d 1092, 1095 (N.Y. App. Div. 2017); *Denton*, 320 B.R. at 500 (citing *Conte v. Justice*, 996 F.2d 1398, 1400 (2d. Cir. 1993)).

The state court granted summary judgment in favor of Plaintiffs on four counts: (1) mismanagement of Plaintiffs, (2) division of corporate assets, (3) breach of fiduciary duty, and (4) accounting. The state courts plainly found that Jacobs violated fiduciary duties that he owed. However, I have repeatedly held throughout these proceedings that "defalcation" requires proof of a culpable state of mind, and that the state court decisions reflect no findings as to Jacobs' state of mind or as to any conscious awareness of the risks that he was acting wrongly. *See, e.g.*, AP ECF No. 41, Tr. 4/18/24 at 10:3–10:9.

In New York, to be successful in cause of action for a breach of fiduciary duty, a plaintiff must show (1) the existence of a fiduciary duty, (2) actions constituting a breach of the fiduciary duty; and (3) damages. *Spizz v. Eluz (In re Ampal-American Isr. Corp.)*, 2020 Bankr. LEXIS 2260 (Bankr. S.D.N.Y. 2020) (quoting *Soley v. Wasserman*, 823 F. Supp. 2d 221, 232 (S.D.N.Y. 2011)). None of these elements require proof of the culpable state of mind that proof of "defalcation" requires. Many prior decisions in this Circuit have therefore recognized that a judgment for breach

10

of fiduciary duty does not automatically mean that a debt is nondischargeable under section 523(a)(4). *See In re Hyman*, 502 F.3d at 69 ("breach of fiduciary duties apparently do not, under New York law, consistently require proof of a culpable mental state"); *In re Mal Dunn Assoc., Inc.*, 406 B.R. 622, 633 (Bankr. S.D.N.Y. 2009) ("not every breach of fiduciary duty involves a willful act, gross negligence, or fraud.").

Similarly, the claims of diversion of corporate assets and mismanagement, which Kenger pursued on a derivative basis pursuant to section 720 of the New York Business Corporation Law, did not require a finding of the culpable mental state that proof of "defalcation" requires. Proof of "corporate waste" requires a showing "that no person of ordinary sound business judgment would say that the corporation received fair benefit" from a given transaction. *Aronoff v. Albanese*, 85 A.D.2d 3, 5 (N.Y. App. Div. 1982). That falls far short of the state of mind that "defalcation" requires. The state appellate court in this very case equated Plaintiffs' claims for the "diversion" of assets with its claims for breach of fiduciary duty. *J-K Apparel Sales Co., Inc.*, 189 A.D.3d at 1013. It cited the elements of the claims that Plaintiffs were required to prove in order to be entitled to judgment, and those did not include any showing that Jacobs had acted with a culpable state of mind. *Id.*

The elements of the underlying causes of action therefore did not require proof that Jacobs acted with a state of mind that would constitute "defalcation" as that term is used in section 523(a)(4). The state court opinions also do not contain any findings that Jacobs acted with such a culpable state of mind. The state court held that Jacobs had failed to prove that Kenger received "dividends" in amounts equivalent to the amounts that had been used to pay Jacobs' personal expenses, but it made no findings as to what Jacobs believed in that regard or what Jacobs believed as to the source of the funds that were used to pay his expenses. The state court also found that

11

Kenger did not know of the payments of Jacobs' expenses and therefore could not be said to have ratified them, but that says nothing about what Jacobs' state of mind was.

There are some factual holdings that the state court made that are binding on Jacobs – for example, its finding that the monies at issue actually belonged to J-K and S&I, and its finding that Kenger did not know that Jacobs was having the PG entities make payments of Jacobs' personal expenses. Accordingly, I have refused Jacobs' repeated efforts to challenge those findings and to relitigate the extent of Kenger's knowledge. However, findings of a culpable state of mind that is necessary to show "defalcation" were not made by the state courts and were not required in order to sustain the claims against Jacobs. A culpable state of mind therefore cannot be inferred from the state court decisions or from the fact that a judgment was entered by the state court. *See Pappas v. Gucciardo (In re Gucciardo)*, 577 B.R. 23, 33 (Bankr. E.D.N.Y. 2017) (holding that the finding of the state court did not have collateral estoppel effect as to section 523(a)(4) where the state court made no finding of state of mind); *see In re Hyman*, 502 F.3d at 69–70 (holding that a state court's award of judgment for breach of fiduciary duty did not have collateral estoppel effect to determine nondischargeability under section 523(a)(4) because a determination of the defendant's state of mind was not necessary to the state court's findings).

In order to obtain an exception from discharge, Plaintiffs were required to show that Jacobs had the required state of mind at the time of the underlying events. They were entitled to offer evidence of Jacobs' actions and to argue that he acted with a culpable state of mind, and were entitled to ask me to infer from the circumstances that Jacobs had acted with the required state of mind. But I required evidence on those issues. The state court decisions did not resolve them.

12

**Evidence Presented at Trial**

At trial, Jacobs testified under oath and was cross-examined by Plaintiffs. Jacobs testified that Prestige Global Company Limited (PG-Taiwan) was formed in Taiwan to act as a sourcing company for the production of merchandise for big box retailers. AP ECF No. 41, Tr. 4/18/24 at 94. The six owners at the time were Mark Cheng, Herman Wang, Steve Kenger, and Jacobs (each of whom owned a 19% interest) and David Lee and Robert Lei (each of whom owned a 12% interest). Eventually, Robert Lei left the company, and the percentages were modified, so that Mr. Lee held a 16% interest and each other owner held a 21% interest. Jacobs testified that he understood that the percentage ownership interest of each party represented his ownership share in PG-Taiwan and all its entities.

Jacobs testified that at some point he and Kenger decided to form J-K and S&I in New York. The companies would locate customers for products manufactured in one of the various PG factories. J-K and S&L were paid a commission fee from PG-Taiwan. The commissions represented a percentage of the total commissions being collected from the factories and the retailers. This commission was typically around 3%. J-K and S&I also received commissions for bringing in new customers. Commission payments were paid to J-K and/or S&I by PG-Taiwan.

Jacobs testified that shareholder Mark Cheng and his executive assistant, Linda Chen, who were based in the PG-Taiwan office, were responsible for calculating the commissions to be paid to J-K and S&I. The money would then be sent directly to either J-K or S&I on a monthly basis.

Jacobs and Kenger were paid salaries from J-K and S&I of about $400,000 a year. Jacobs testified that in addition to their salaries, Jacobs and Kenger received payments from PG-Taiwan or from other PG companies. He testified that Cheng and Chen prepared financial statements that set out the company's cash position, profits, receivables, and other financial information; that Mr.

13

Cheng would distribute those statements to the other shareholders, including Jacobs and Kenger; and that the partners would meet and would use this information to calculate profit shares every six months. According to Jacobs, the shareholders voted each six months to divide and distribute half the profits and to hold the other half as cash and as reserves. Each partner's portion of the "split" profits would be kept in a record maintained and controlled by PG-Taiwan and located in Taiwan.

Jacobs testified that Cheng kept a "black notebook" in which he recorded the profit splits. AP ECF No. 41, Tr. 4/18/24 at 127:2–127:3. Jacobs' "personal account" was comprised of his profit splits plus a $10,000 monthly deposit that was made on a running basis, minus any payments and distributions made to Jacobs or on his behalf. *Id.* at 144:24–145:6. The $10,000 represented a monthly allowance for American Express payments or for other expenses. The parties stipulated that both Jacobs and Kenger were entitled to such an allowance of $10,000 a month. *Id.* at 158:12–22. Jacobs offered various exhibits into evidence that referred to various "splits" that had been decided and to the balance of his "personal account" with PG.

Jacobs testified that in order to access money from their personal accounts, partners (including Jacobs and Kenger) would email Cheng and request that a transfer be made to themselves or to a third-party. Cheng or Chen would email back a confirmation after the transfer had been made. Jacobs testified that he had regular discussions back and forth with Chen and Cheng about where money was coming from as he requested transfers to be made on his behalf. *Id.* at 146:10–20. There were a multitude of emails introduced into evidence that referred to payments as having been made on his behalf from his "personal account." Jacobs further testified that he understood and believed, based on many conversations between the partners about this, the other partners also received their split money in this same manner.

14

Jacobs testified that "I absolutely never diverted money, nor would I have to divert money from my own company." *Id.* at 165:14–18. He stated that, at the time, he believed that the money in his personal account was "split money and Amex money," not money belonging to J-K and/or to S&I. *Id.* He admitted that he did not report this "personal account" income on his federal tax returns. He also knew he was committing violations of the tax laws. *Id.* at 174:6–7 ("We all knew [that the income should have been reported to the IRS]. We all discussed it. All five of us [partners] knew very well."). Jacobs eventually was indicted and pleaded guilty for tax fraud for not paying taxes on the income earned overseas.

The state court found that the particular monies used to pay Kenger's personal expenses should have been paid to J-K and S&I. I cannot and will not disturb those factual findings. The state court also found that Kenger did not know that Jacobs' personal expenses were being paid with these funds. I similarly cannot and will not disturb those findings. At trial, however, the parties offered into evidence testimony by Kenger in which he referred to the PG companies as having involved an "overseas trust," and in which Kenger admitted that twice per year "everyone" would sit down to decide on what "bonus commissions" would be paid by the trust. Kenger also acknowledged that he had personally received such "bonus commissions" and had deposited them in a Singapore bank account. He also testified that the "bonus commissions" were referred to as "splits." That testimony verified that at least some monies paid by the PG companies were routinely paid directly to Jacobs and Kenger and not to J-K and S&I.

Kenger was identified as a potential witness but he successfully eluded the service of a subpoena and he did not appear at trial. Plaintiffs offered no testimony to rebut Jacobs' testimony as to how the payment arrangements worked and as to what Jacobs understood and believed.

15

As a whole, the evidence was not sufficient to prove that Jacobs acted with the culpable state of mind that a finding of "defalcation" would require. Jacobs' may have been wrong in thinking that he was having his expenses paid from "profit splits" instead of from funds that belonged to J-K and S&I, but his testimony that he had such a belief was credible and the evidence at trial showed that such a belief was a reasonable one. No evidence to the contrary was provided. Plainly, Jacobs intended to defraud tax authorities, but that means only that he knew that he had received income and did not report it. (The evidence at trial showed that Kenger made a similar guilty plea to charges that he had failed to report income.) The issue before me is whether Jacobs actually knew (or was willfully blind to the fact) that he was taking money that properly belonged to J-K and S&I and not to him personally; whether Jacobs properly paid taxes on the money he received is not relevant to that question.

In their posttrial brief, Plaintiffs argue that I must find that Jacobs acted with a culpable state of mind because "it is obvious that Jacob's knew that the monies diverted were J-K/S&I's money." AP ECF No. 40, at 15. There was nothing in the evidence at trial that made that "obvious" at all. If it were truly obvious, then I presume that Plaintiffs would have provided this Court with evidence as to whether the owners actually agreed to make profit splits, or otherwise supporting Plaintiffs' contention that Jacobs knew he was taking money that belonged to J-K and S&I and not just directing that his expenses be paid out of separate profit splits. The Plaintiffs offered no such evidence. Plaintiffs were steadfast in arguing that Jacobs acted deliberately and with knowledge of wrongdoing, but their claim required evidence, not just a stubborn insistence. Plaintiffs offered no convincing evidence (indeed, they offered virtually no evidence at all) to rebut Jacobs' testimony as to what he understood and believed.

16

### Other Issues

Jacobs asked the Court to draw an adverse inference against Plaintiffs due to Kenger's refusal to produce certain documents in response to a subpoena and the refusal of Plaintiffs to call Kenger to testify during the trial.  AP ECF. No. 19, at ¶ 30.  There might have been grounds to support such an adverse inference, but I decline to draw an adverse inference as it is not necessary to this decision.

Jacobs also asked the Court to sanction the Plaintiffs' attorney for "prosecuting an action for an improper purpose, without nonfrivolous legal bases, or without evidentiary support."  *See* AP ECF No. 45, at 7 (citing Fed. Bankr. R. 9011 and 28 U.S.C. § 1927).  While Plaintiffs did not carry their burden of proof, they prosecuted the case in good faith and for no improper purpose, and I decline to impose any sanctions.

### Conclusion

For the foregoing reasons, the Court will enter an order declaring that the state court judgment debt in the amount of $2,981,904.21 is not excepted from discharge.

Dated:  New York, New York
      July 29, 2024

        /s/Michael E. Wiles
        THE HONORABLE MICHAEL E. WILES
        UNITED STATES BANKRUPTCY JUDGE